IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| LESLEY M. FIX, | CV 16-41-M-DLC-JCL |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATION |
| THE HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, | |
| Defendant. | |

Before the Court are the parties' Fed. R. Civ. P. 56 cross motions for summary judgment. Plaintiff Lesley Fix seeks to establish her continued eligibility for benefits under a disability insurance plan governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. For the reasons discussed, the Court recommends Fix's motion be denied, and Defendant The Hartford Life and Accident Insurance Company's ("Hartford") motion be granted.

## I.    Introduction

In 2011, Plaintiff Lesley Fix worked as a financial advisor for Edward D. Jones & Co., L.P. Her employment enabled her to participate as a beneficiary in an employee welfare benefit plan that provided long-term disability insurance

benefits to employees ("the Plan").  Hartford is the claims administrator responsible for reviewing claims for disability benefits submitted by employees under the Plan.

Fix asserts she developed a "pseudomotor cerebral tumor, benign intracranial hypertension, depression, and anxiety" caused by an increase in cerebrospinal fluid pressure in her brain.  (Doc. 1 at 3.)  As a result, Fix experienced migraine headaches, visual disturbances, and what she characterizes as "impaired, inefficient cognition."  (Doc. 26 at 7.)

On January 20, 2012, Fix underwent "a cranial shunt operation for pseudotumor cerebri" to drain fluid pressure from her brain.  (Doc. 11 at 2.)  Although Fix states the shunt procedure was successful, she asserts she continued to experience headaches, fatigue, and cognitive impairment.

Due to her conditions, Fix discontinued her employment in September, 2011, and she submitted a claim for disability insurance benefits under the Plan.  On January 20, 2012, Hartford approved Fix's claim and began paying her disability benefits.

On February 15, 2013, Hartford notified Fix it was terminating her benefits effective March 7, 2013.  In response, Fix's husband informed Hartford that Fix had been seeing a speech therapist due to her cognitive deficits.  Hartford

2

reviewed the records from the speech therapist, determined Fix could not return to work, and it reopened her claim for benefits.

On September 4, 2014, Hartford notified Fix she no longer qualified for benefits under the Plan and it terminated her benefits. Fix appealed the termination decision, and on April 20, 2015, Hartford issued its final determination upholding its decision to terminate Fix's benefits. This action ensued.

## II.   Applicable Law – Summary Judgment and Bench Trial

Although the parties appropriately rely upon Federal Rule of Civil Procedure 56, in an ERISA case where the abuse of discretion standard applies "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999)). The summary judgment motions present the case for resolution by way of a bench trial conducted solely upon a review of the administrative record. *See Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009) and *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999). A bench trial on the record requires the Court to make findings of

3

fact under Fed. R. Civ. P. 52(a) which provides that "[i]n an action tried on the facts without a jury [...], the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1) and *Kearney*, 175 F.3d at 1095.

## III.  Discussion

Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of facts and conclusions of law:

### A.  ERISA

Fix commenced this action under ERISA at 29 U.S.C. § 1132(a)(1)(B) which authorizes a civil action to obtain insurance plan benefits as follows:

§ 1132. Civil enforcement

(a) Persons empowered to bring a civil action

A civil action may be brought–

(1) by a participant or beneficiary–

[...]

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]

29 U.S.C. § 1132(a)(1)(B).  *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).

**B.**     <u>**Standard of Review Under ERISA**</u>

The terms of the Plan grant Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy." (Doc. 20 at AR0025.) The parties agree this language requires the Court to evaluate whether Hartford's decision to terminate Fix's benefits was an abuse of discretion. *See Abatie v. Alta Health & Life Ins.*, 458 F.3d 955, 963-65 (9th Cir. 2006), and *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 981 (9th Cir. 2005) (finding grant of discretionary authority establishes abuse of discretion standard of review).

The abuse of discretion standard requires the court to give deference to the ERISA insurer's decision. *Metropolitan Life Ins. Co.*, 554 U.S. at 111. "[T]he plan administrator's interpretation of the plan [and its benefits decision] 'will not be disturbed if reasonable[,]'" (*Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (quoting *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 111 (1989))), and not "arbitrary and capricious." *Tapley v. Locals 302 and 612 of the International Union of Operating Engineers–Employers Construction Industry Retirement Plan*, 728 F.3d 1134, 1139 (9th Cir. 2013) (quotation and citation omitted). The abuse of discretion standard equates to an arbitrary and capricious standard of review. *Tapley*, at 1139.

"ERISA plan administrators abuse their discretion if they render decisions without any explanation, ...construe provisions of the plan in a way that conflicts with the plain language of the plan, [...] rel[y] on clearly erroneous findings of fact[,]" (*Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012) (quotations and citations omitted)), or "fail[] to develop facts necessary to [their] determination[s]." *Pacific Shores Hospital v. United Behavioral Health*, 764 F.3d 1030, 1042 (9th Cir. 2014) (quotation and citation omitted).  A factual determination may be clearly erroneous when, although there is evidence to support it, the court is "left with a definite and firm conviction that a mistake has been committed." *Pacific Shores Hospital*, 764 F.3d at 1042 (quotations and citations omitted).

### C.    Hartford's Conflict of Interest

The parties also agree that Hartford operated under a structural conflict of interest during the time it evaluated Fix's conditions and terminated her award of benefits.  The conflict arises because Hartford serves as both the administrator that decides whether to grant or deny claims for benefits, and as the entity funding the benefits if granted.

ERISA administrators often serve in a dual role capacity by both determining whether an employee is eligible for benefits and, if granted, paying

6

those benefits "out of its own pocket."  *Metropolitan Life Ins. Co. v. Glenn*, 554

U.S. 105, 108 (2008).  Those circumstances create a conflict of interest for the

claims administrator, and in assessing whether the administrator abused its

discretion in denying a claim for benefits the court should consider that conflict as

a factor and assess the weight to be given the factor, on a case-by-case basis.  *Id.*

*See also Abatie*, 458 F.3d at 968-69.  The abuse of discretion standard of review is

"informed by the nature, extent, and effect on the decision-making process of any

conflict of interest that may appear in the record."  *Abatie*, 458 F.3d at 967.  But

the mere existence of the conflict of interest, without more, renders it "but one

factor among many that a reviewing judge must take into account[]" without

affording that factor greater weight than any other factor.  *Metropolitan Life Ins.*

*Co.*, 554 U.S. at 115-19.

In certain situations, however, an ERISA administrator's conflict of interest

may be given greater weight.

> The level of skepticism with which a court views a conflicted
> administrator's decision may be low if a structural conflict of interest is
> unaccompanied, for example, by any evidence of malice, of self-dealing, or
> of a parsimonious claims-granting history.  A court may weigh a conflict
> more heavily if, for example, the administrator provides inconsistent
> reasons for denial, [...]; fails adequately to investigate a claim or ask the
> plaintiff for necessary evidence, [...]; fails to credit a claimant's reliable
> evidence, [...]; or has repeatedly denied benefits to deserving participants by
> interpreting plan terms incorrectly or by making decisions against the
> weight of evidence in the record.

*Abatie*, 458 F.3d at 968-69 (citations omitted).

Here, although Fix notes Hartford operated under a structural conflict of interest, she identifies no reason, nor advances any argument suggesting the Court should give more than equal weight to the conflict of interest factor. Therefore, the Court will consider Hartford's conflict as but one of the multiple factors to be weighed in the abuse of discretion analysis.

**D.    Fix's Claim and Hartford's Termination of Benefits**

Hartford filed its administrative record relevant to Fix's claim for disability benefits. The parties agree the administrative record provides the undisputed facts in this case. Therefore, the summary of the relevant facts are taken from that record.

The provision of the Plan applicable to Fix's eligibility for disability benefits defines "Disability or Disabled" as follows:

> Disability or Disabled means You are prevented from performing one or more of the Essential Duties of:
> 1) Your Job during the Elimination Period; and
> 2) You are receiving appropriate care and complying with the requirements of such treatment.

(Doc. 20 at AR 00025.)

On October 10, 2011, Fix's treating neurologist, Dr. Bret Lindsay, provided a statement to support Fix's claim for benefits. At that time, although Dr. Lindsay

found she could not return to unrestricted work, he concluded she would not have permanent work restrictions.

Fix's treating neurological surgeon, Dr. Thomas Origitano, performed Fix's shunt procedure on January 20, 2012. The procedure reportedly went well, and by February 3, 2012, Dr. Origitano noted Fix's visual disturbances had decreased. (Doc. 20 at AR0365-66.)

On February 2, 2012, Fix reported to Dr. Lindsay her headaches and vision symptoms had improved since the shunt procedure. Dr. Lindsay concluded Fix was clinically doing much better with respect to her vision and headaches, and he directed her to return to him only on an as needed basis.

In June, 2012, Fix informed Hartford she was pregnant. She began seeing a psychologist for anxiety associated with the pregnancy.

On August 16, 2012, Hartford contacted Dr. Origitano's office. An assistant at the office confirmed Fix last visited Dr. Origitano in May, 2012, and that Dr. Origitano did not place any work restrictions or limitations on Fix. (Doc. 20 at AR0147-48.)

On August 30, 2012, Fix informed Hartford that her treating obstetrician/ gynecologist, Dr. John Lavin, precluded her from working at all. Dr. Lavin believed her medical conditions and work requirements placed her pregnancy at

high risk.  On October 24, 2012, Dr. Lavin provided a statement in which he noted Fix experienced some intermittent visual issues due to her pseudotumor, but that she had no psychiatric/cognitive impairment.  (Doc. 20 at AR0305.)  Dr. Lavin precluded Fix from working while she was pregnant, and for 6 weeks post-partum. (*Id*.)

On November 9, 2012, Hartford received a fax from Dr. Lindsay's office stating that although Dr. Lavin had prohibited Fix from working, Dr. Lindsay did not.  Fix gave birth to her child on February 7, 2013.

On February 15, 2013, Hartford notified Fix it determined she was no longer disabled after March 7, 2013, and that it was terminating her disability benefits.  In response, Fix's husband, Darren Fix, informed Hartford that Dr. Lindsay referred Fix to an occupational therapist, Dr. Chare Largent.

On April 12, 2013, Dr. Largent reported that during therapy Fix had "completed 5 logical solutions puzzles with 100% accuracy and completed them more quickly than most."  (Doc. 20 at AR0226.)  Nonetheless, Dr. Largent did not release Fix to return to work.

Due to Fix's occupational therapy, on April 16, 2013, Hartford reopened Fix's claim, and it referred the claim to a Behavioral Health Case Manager for review.  As a result, a nurse working for Hartford reviewed the claim file on May

10

28, 2013, and decided that due to Fix's cognitive deficits she would not be able to return to work at that time.

On March 13, 2013, Dr. Largent administered a Repeatable Battery for the Assessment of Neuropsychological Status test.  The results of that test are in the administrative record.  (Doc. 20 at AR0235.)  Hartford reviewed those test results on May 28, 2013, and it concluded that due to Fix's cognitive deficits she could not return to work at that time.  (Doc. 20 at AR0121.)

Hartford's nurse visited with Dr. Largent on May 30, 2013, and Dr. Largent advised Fix was improving, but continued to have problems with memory, attention, concentration and distractions.  Therefore, at some point in the Spring of 2013 Hartford reinstated Fix's disability benefits.

Fix's treatment with Dr. Largent continued.  On June 21, 2013, Fix reported to Dr. Largent that she had taken a vacation and experienced only one headache, and that she was able to manage the vacation without getting overwhelmed.  (Doc. 20 at AR0211.)  Dr. Largent retired in September, 2013.

On November 4, 2013, Fix visited Dr. Origitano's office and met with a physician's assistant, Scott Seager.  Fix reported experiencing anxiety and depression, but Dr. Origitano opined those conditions were not related to her shunt.  (Doc. 20 at AR0741.)  Fix further reported she had not experienced

significant headaches, or photophobia seizures, weakness, or paresthesias.  (Doc. 20 at AR0742.)

In 2013 Fix was under the care of a neuropsychologist, Edward Trontel.  Dr. Trontel prepared a psychological evaluation dated December 18, 2013, in which he reported finding "no clear signs of significant cognitive impairment[.]"  (Doc. 20 at AR0699.)  Dr. Trontel found Fix experienced numerous life "stressors that are independent of her medical difficulties."  (Doc. 20 at AR0702.)

On April 21, 2014, Dr. Trontel prepared a statement noting Fix's condition had changed in that he found no cognitive problems or clinical depression.  (Doc. 20 at AR0706.)  He reported Fix's status as "improved," but concluded her return-to-work date was unknown.  (Doc. 20 at AR0696.)

On April 22, 2014, physician's assistant, Lacey Griffin, prepared a statement of Fix's condition on behalf of Dr. Origitano.  Ms. Griffin did not report any restrictions or limitations imposed upon Fix.  (Doc. 20 AR0728.)

On April 30, 2014, Fix had a hysterectomy surgery.  Dr. Lavin directed Fix to take 6 weeks off for recovery.

On May 12, 2014, a Hartford examiner visited with an assistant at Dr. Lindsay's office about Fix.  The examiner learned Fix had not seen Dr. Lindsay since December 5, 2013, and Fix was not scheduled for any follow-up visits.

On May 22, 2014, Dr. Lavin prepared a statement in which he reported he found Fix did not have any notable impairment and she was subject to "no restrictions." (Doc. 20 at AR0669.) Dr. Lavin confirmed Fix was released to return to work as of May 22, 2014.

Hartford sent Fix's claim file for an independent review by a psychologist, Dr. Cindy Strege Morey. Dr. Morey visited with Dr. Trontel on May 20, 2014, and Dr. Trontel reported Fix's daily functioning was unrestricted from a psychological perspective. (Doc. 20 at AR0645.) Dr. Trontel noted only that Fix's working memory and ability to multi-task is affected by fatigue. (*Id*.) Also, on May 27, 2014, Dr. Morey spoke with Fix for almost an hour.

Dr. Morey reviewed Dr. Trontel's treatment notes and found the notes reflected that no severe cognitive impairments in functioning were observed in testing. Dr. Morey concluded the clinical evidence did not reflect that Fix had any psychological condition that was functionally impairing, and Dr. Morey explained the numerous reasons for her conclusion. (Doc. 20 at AR0651-52.) Dr. Morey identified the absence of several impairment factors and circumstances which, therefore, support the conclusion Fix was not impaired psychologically. Specifically, Dr. Morey noted Fix had not been referred to a psychiatrist for psychiatric medication, had not had any psychiatric hospitalizations, and had not

13

undergone intensive mental health care and treatment as would be expected for an individual suffering from an impairing psychological condition. (Doc. At AR0651-52.)

Based on the foregoing, the record reflects that by June, 2014, Fix was treated by three physicians, each of whom did not impose restrictions upon Fix: Dr. Origitano's April 22, 2014 statement reported no restrictions or limitations; Dr. Trontel concluded Fix's daily functioning was unrestricted; and Dr. Lavin released Fix to unrestricted work as of May 22, 2014.

In July, 2014, Hartford referred Fix's claims file for another independent medical review. Consequently, a board certified neurological surgeon, Dr. Michael Levy, reviewed Fix's medical records, and he visited with Dr. Origitano about Fix on July 31, 2014. Dr. Origitano reported that from a neurosurgical standpoint he had no opinion regarding Fix's return-to-work status. Based on Dr. Levy's review of Fix's medical records, and his visit with Dr. Origitano, he found that "[f]rom a neurosurgical standpoint, there is no limitation of functional capacity [and Fix] is reasonably capable of physically performing up to 40 hours/week." (Doc. 20 at AR0617.) Dr. Levy further found that Fix had experienced a resolution of her headaches and visual disturbances as reported by Dr. Origitano on January 3, 2014.

Based on the totality of Fix's medical records and the independent reports from Dr. Morey and Dr. Levy, Hartford concluded the evidence established Fix did not have any medically supported restrictions or limitations. Therefore, on September 4, 2014, Hartford notified Fix and her employer it terminated her disability benefits because the information in the claim file established Fix was not disabled from performing her occupation. (Doc. 20 at AR0810.) The letter to Fix identified all of the evidence on which Hartford relied in making its decision. Fix appealed Hartford's termination of benefits.

### E.   **Hartford's Review on Appeal**

To address Fix's appeal, Hartford referred Fix's claim file to an independent certified psychologist and neuropsychologist, Dr. Nick Defilippis. Dr. Defilippis reviewed Fix's medical records and visited with Dr. Trontel who opined that Fix had no psychological or cognitive problems that would interfere with her work. (Doc. 20 at AR0544.) Dr. Defilippis called Dr. Origitano's office and spoke with the physician's assistant who treated Fix. The physician's assistant reported finding Fix had no cognitive problems. Dr. Defilippis also contacted Dr. Lindsay who reported he had not seen Fix for some time. Dr. Defilippis concluded Fix's medical records did not establish Fix was limited in her functional abilities from September 5, 2014, through April, 2015. He concluded Fix "can perform full time

work duties on a consistent basis." (Doc. 20 AR0546.)

Hartford also referred Fix's claim file to a board-certified neurological surgeon, Dr. Nirav Shah. Dr. Shah attempted to contact Dr. Origitano and Dr. Lindsay, but was unsuccessful in making contact. Dr. Shah visited with Dr. Trontel who confirmed he did not impose any specific restrictions on Fix. (Doc. 20 at AR0555.) Dr. Shah similarly concluded the medical evidence did not support a finding that Fix's functional abilities were limited from September 5, 2014, through April, 2015, and he explained in detail his various reasons for his conclusion. (Doc. 20 at AR0549-50.) He opined Fix could perform consistent full time work 40 hours per week.

Following Dr. Shah and Dr. Defilippis' reports, on April 20, 2015, Hartford notified Fix of its decision on appeal upholding its decision to terminate her benefits. In its letter Hartford detailed the reasons for its decision on appeal. (Doc. 20 at AR0787-92.)

After its decision on appeal Hartford received further information from Dr. Lindsay. Dr. Lindsay reported Fix was subject to "no real restrictions" except that she should avoid triggers for migraine headaches, and he reported there were no exam findings that supported a need for restrictions. (Doc. 20 at AR0536.) Dr. Shah responded to that additional information stating that Dr. Lindsay's

16

information confirmed Fix could return to work and there were no reasons for restrictions.  (Doc. 20 at AR0524.)

### F.  **Fix's Contentions Challenging Hartford's Decision**

#### 1.  **Reports From Fix's Treating Physicians**

Fix asserts the medical reports from her treating medical care providers establish she was impaired at the time Hartford terminated her benefits. Specifically, she contends it is reported that she was impaired by headaches and cognitive problems cause by her pseudotumor cerebri.

#### a.  **Dr. Trontel**

Fix first cites to Dr. Trontel's April 21, 2014 statements as to her disability. She points out that Dr. Trontel reported her "initial cognitive disruption was marked," that her "emotional/psychological/neurocognitive sequelae vary," and her attention and concentration fluctuates from mild to severe.  (Doc. 20 at AR0696, 706.)  But significantly, the Court finds in that same statement Dr. Trontel reported Fix had no cognitive problems or clinical depression, and that her status had improved.  (Doc. 20 at AR0696, 706.)  That information is consistent with Dr. Trontel's December 18, 2013 finding of "no clear signs of significant cognitive impairment[.]"  (Doc. 20 at AR0699.)

Furthermore, as noted, the Court finds Dr. Trontel told Dr. Morey that Fix's

daily functioning was unrestricted from a psychological perspective. And in March, 2015, Dr. Trontel informed Dr. Defilippis that Fix had no psychological or cognitive problems that would interfere with work. (Doc. 20 at AR0544.) Therefore, the Court concludes Hartford's failure to find that Dr. Trontel's opinion supported a finding Fix was disabled was not arbitrary or capricious.

### b.   Dr. Lindsay

Fix next relies on Dr. Lindsay's most recent reports. In January, 2015, he reported that Fix continued to struggle significantly with recurrent headaches and fatigue. He concluded Fix was not then presently capable of "working in a competitive arena." (Doc. 20 at AR0594.) Subsequently, on April 21, 2015, Dr. Lindsay reported Fix had frequent severe headaches, and memory/cognitive dysfunction secondary to pain. (Doc. 20 at AR0533.) Dr. Lindsay also reported Fix was not able to work in a competitive arena due to absenteeism caused by unpredictable and frequent headaches. (*Id.*)

But the Court finds Dr. Lindsay's reports nonetheless conclude Fix is not restricted. Significantly, on April 21, 2015, Dr. Lindsay reported Fix was subject to no real restrictions, and there were no exam findings that supported restrictions. (Doc. 20 at AR0536.) Therefore, although Dr. Lindsay's report may appear somewhat inconsistent, ultimately – and consistent with his earlier report of

November 9, 2012 – he imposed no work restrictions upon her.  Consequently, the

Court concludes it was not arbitrary or capricious for Hartford to conclude Dr.

Lindsay's opinions did not support a finding that Fix was disabled under

Hartford's Plan.

### c.     <u>Dr. Origitano</u>

Fix also points out that in May or June, 2014, Dr. Origitano responded to a

questionnaire agreeing he was recommending Fix refrain from work at that time.

(Doc. 20 at AR0633.)  But as noted, when Dr. Levy visited with Dr. Origitano on

July 31, 2014, Dr. Origitano had no opinion regarding Fix's return-to-work status.

Furthermore, on April 22, 2014, Dr. Origitano's office provided a statement that

did not impose any work restrictions on Fix.  (Doc. 20 at AR0728.)  And on April

6, 2015, Dr. Origitano's office reported it did not observe cognitive problems with

Fix.  (Doc. 20 at AR0544.)

In addition to the information from Drs. Trontel, Lindsay, and Origitano,

Dr. Lavin similarly imposed no restrictions on Fix, and he released her to work as

of May 22, 2014.

Based on the information from Fix's treating medical care providers, it is

fair to say those providers did not find Fix was impaired and did not impose work

restrictions on her.  Therefore, Hartford's decision that Fix was no longer disabled

was reasonable based on the medical opinions from Fix's treating medical care providers.  Hartford's decision was not arbitrary or capricious.

### 2.   **Medical Improvement**

Fix argues that since Hartford had been paying her disability benefits since January, 2012 – having found she was disabled – it was arbitrary and capricious for Hartford to terminate that award of benefits without first finding her conditions had sufficiently changed and improved to where she was no longer disabled.  She asserts Hartford was required to identify evidence in the record which demonstrates her medical improvements and warrants a termination of her benefits.

But as noted and discussed in the immediately preceding section of this recommendation, Fix's treating medical care providers had found improvements in Fix's conditions and chose not to impose work restrictions upon her.  Therefore, Fix's challenge in this regard lacks merit.

### 3.   **Fix's Asserted Migraine Headaches**

Fix argues the record reflects she was disabled from her migraine headaches.  The Court disagrees.

Hartford relied upon the opinion of its reviewing neurological surgeon, Dr. Shah, who addressed the issue of Fix's headaches.  Dr. Shah identified potential

symptoms from pseudotumor a person could experience that would be disabling. (Doc. 20 at AR0550.)  He advised that individuals with intracranial hypertension could have several symptoms related to intracranial pressure and papilledema, and he identified those numerous specific symptoms.  (*Id*.)  But Dr. Shah found Fix did not experience any of those various symptoms "in a persistent fashion or at all to warrant impairment from September 5, 2014, through April, 2015."  (*Id*.)

Dr. Shah also identified common migraine headache medications that would ordinarily be prescribed for a patient suffering from debilitating migraines.  (Doc. 20 at AR0550.)  But he noted that none of the identified medications had been prescribed for Fix, and he stated that the absence of those prescriptions supported "a lack of confidence that the claimant is actively suffering from the pseudotumor disorder."  (*Id*.)

Dr. Shah also identified various surgical interventions which could be used on a patient suffering from debilitating migraine headaches.  (Doc. 20 at AR0550.)  But he found none of the referenced procedures have been used with Fix and, therefore, "the lack of surgical, neurological, and objective findings" indicated Fix did not have limited functional abilities resulting in an impairment.  (*Id*.)  Thus, Dr. Shah identified objective reasons supporting a conclusion that Fix was not disabled.

Furthermore, any mention of Fix's headaches in the administrative record are limited.  In July, 2013, Fix had taken a vacation and reported only one significant headache.  In November, 2013, Fix told Dr. Origitano she had not had significant headaches or photophobia seizures.

The Court thus concludes Hartford's decision that Fix was not impaired by her headaches was reasonable.  Its decision in that regard is supported by the administrative record and, thus, is not arbitrary or capricious.

### 4.    Fix's Subjective Complaints of Disabling Conditions

Fix next suggests Hartford did not give adequate weight to her subjective complaints of disabling headaches or migraines, and her diminished cognitive abilities.  But, as a matter of law, it is reasonable for a plan administrator to seek objective evidence demonstrating how a claimant's medical conditions affect his or her functional capacity to perform work.  *Fisher v. Continental Casualty Company*, 2012 WL 3100560, *3 (D. Mont. 2012).  As discussed, Dr. Morey noted the absence of intensive psychological treatment and care in Fix's medical history, and Dr. Shah noted the absence of objective indicators of significant headaches.  And consistent with the absence of intensive treatment and care, most of Fix's treating providers imposed no work restrictions upon Fix.  This lack of objective evidence of functional impairment, and the absence of medical

22

restrictions, are reasonable grounds on which Hartford could rely to decline to give significant weight to Fix's subjective complaints.

### 5.    Hartford's Reliance Upon Non-Examining Consultants

Fix challenges Hartford's decision on the ground that it relied on non-examining medical care consultants who reviewed only Fix's medical records. She argues the practice of relying upon medical opinions that are based only on a medical paper review and not direct examinations of the claimant is disfavored.

Fix's argument about the non-examining, paper reviews conducted by Hartford's independent consultants is not entirely factually supported. As noted, Dr. Morey spoke directly with Fix for about an hour. Dr. Morey, Dr. Defilippis, and Dr. Shah all visited directly with Fix's treating neuropsychologist, Dr. Trontel, and Dr. Levy visited with Dr. Origitano about Fix. Thus, the reviewing medical consultants obtained first-hand information directly from Fix's treating care providers, and Fix herself. And under ERISA, plan administrators are not required to seek independent medical examinations. *Kushner v. Lehigh Cement Company*, 572 F. Supp. 2d 1182, 1192-93 (C.D. Cal. 2008) (citing cases).

Furthermore, as a matter of law, under ERISA the "courts are not required to 'accord special weight to the opinions of a claimant's physician.'" *Muniz v. Amec Construction Management, Inc.*, 623 F.3d 1290, 1297 (9th Cir. 2010) (quoting

23

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).  Nor is there a

heightened burden of explanation required when a treating physician's opinion is

rejected.  *Nord*, 538 U.S. at 831.

Additionally, an ERISA plan administrator may properly rely upon

independent medical opinions that are based only upon a review of a claimant's

medical records without a personal examination of the claimant.  *See Kushner v.*

*Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1191-92 (C.D. Cal. 2008) (citing

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th

Cir. 2004)).

Therefore, the Court concludes Hartford did not abuse its discretion by

relying upon medical professionals who reviewed Fix's medical records, and not

deferring to the opinions of Fix's treating medical professionals.

### 6.   March, 2013 Neuropsychological Test

Fix complains Hartford failed to address the significance of the results of

her March, 2013 Repeatable Battery for the Assessment of Neuropsychological

Status test which Hartford itself had agreed supported a finding that Fix was

disabled.  She complains Dr. Morey entirely ignored the results of that test, and

Dr. Defilippis did not adequately address those results.

But, to the contrary, Dr. Defilippis did address the results of the test in his

24

April, 2015 report.  He noted the test did not include an "effort test," and consequently the test was "of limited utility in identifying cognitive impairments in the claimant."  (Doc. 20 at AR0545.)  Further, Dr. Defilippis found that other neuropsychological measures administered by Dr. Largent were within normal limits.  (*Id*.)  Therefore, the Court concludes Hartford did not arbitrarily or capriciously ignore the results of the March, 2013 test.

Fix further complains Hartford did not give her notice of Dr. Defilippis' criticisms of the March, 2013 test until after Hartford upheld the termination of her benefits on appeal.  And Fix argues Hartford was obligated to communicate to her its concerns about the test results.  (Doc. 30 at 8 (citing *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997)).  But the Court finds Fix's reliance on *Booton* is misplaced.

In *Booton*, the Ninth Circuit addressed an ERISA regulation specifying certain information an ERISA plan administrator is required to provide to a claimant.  *Booton*, 110 F.3d at 1463 (citing 29 C.F.R. § 2560.503-1(f) (requiring a plan administrator to provide to the claimant a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary")).  In *Booton*, the court found the administrative record was incomplete, and thereby prevented the

plan administrator from making a rational decision, yet the administrator denied the claim without first explaining to the claimant what additional information the claimant needed to provide to the administrator to support the claim and to enable the administrator to make a rational decision.  *Id*. at 1465.

The circumstances in which a plan administrator is required to request additional information from a claimant as discussed in *Booton* did not exist in Fix's case.  Fix's claims file was not missing necessary information from medical care providers which, if it existed and if it had been requested by Hartford, would have supported Fix's claim.  The circumstances of Fix's case, and the sufficient and adequate content of the materials in her claims file, enabled Hartford to make a rational decision and, thus, negated any duty Hartford may have had to request further medical information from Fix.  Therefore, contrary to Fix's assertion, *Booton* did not require Hartford to provide Fix with advance notice of its criticisms of the March, 2013, test results.

## IV.   Conclusion

Based on the foregoing, the Court concludes Hartford's decision to terminate Fix's disability insurance benefits was reasonable based upon all the available information contained within Hartford's administrative record.  Its decision was not an abuse of its discretion, and was not arbitrary or capricious.

Therefore, IT IS HEREBY RECOMMENDED that Fix's summary judgment

motion be DENIED, and Hartford's summary judgment motion be GRANTED.

DATED this 6th day of March, 2017.

Jeremiah C. Lynch
United States Magistrate Judge